UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JON REED,
    Plaintiff,

vs.                                                         CIVIL NO. 2:07-CV-15275

MICHAEL J. ASTRUE,                       DISTRICT JUDGE GERALD E. ROSEN
                                                                 MAGISTRATE JUDGE STEVEN D. PEPE

    Defendant.
_____/

## REPORT AND RECOMMENDATION

**1.     Background**

Plaintiff, Jon Reed, brought this action under 42 U.S.C. §405(g) to challenge a final decision of the Commissioner finding that he was not entitled to Disability Insurance Benefits under Title II of the Social Security Act. Plaintiff and Defendant both filed motions for summary judgment. Both motions have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, **IT IS RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED** and the Plaintiff's motion be **DENIED**.

**A.     Procedural History**

Plaintiff, Jon Reed, applied for disability insurance benefits and a period of disability on October 4, 2004, alleging disability since March 26, 2003, due to "chronic low back pain, status post herniated discs and discectomy and a L5 radiculopathy" (R. 19). Plaintiff's application was denied on January 4, 2005 (R. 39-43). Plaintiff appeared, with counsel, at a hearing before administrative law judge ("ALJ") Joel G. Fina on March 5, 2007 (R. 188-220), who denied

1

benefits on March 28, 2007 (R. 17-24). The Appeals Council denied review on October 10, 2007 (R. 4-6).

**B.     Background Facts**

    1.      *Plaintiff's Hearing Testimony and Statements*

Plaintiff was 37 years old at the time of his hearing (R. 57, 193). He graduated from high school, but has no further training. He describes his reading and writing skills as "poor" while his math skills are "fairly good" (R. 193-94). Plaintiff is married, has four children ranging in age from 16 to 5 years old, and lives in a single family home (R. 192-93).

Plaintiff last worked on March 26, 2003, at Super Food Services as a grocery selector supplying consumer goods to grocery stores (R. 194-95). In this position, he operated a double pallet hand jack, shrink wrapped pallets, and engaged in heavy lifting. Plaintiff left this job due to disc herniation in his back. He has not sought subsequent work because his physician, Dr. Awerbach,[1] did not give him clearance to do so (R. 194-95). Plaintiff does not have health insurance, but he did receive a worker's compensation lump-sum annuity (R. 197).

Plaintiff testified that he can shave and shower (R. 198). He rarely cooks, washes dishes sometimes, and mows the lawn using a riding garden tractor (R. 198-200). He never empties the trash, does laundry, sweeps or shovels snow (R. 199-200). Plaintiff sometimes shops with his children who load and empty the shopping cart (R. 200). Plaintiff watches TV for 12 - 18 hours a day, and plays video games once a week (R. 201). He takes approximately 3 daily naps each lasting 2-3 hours. Plaintiff does not use drugs or consume alcohol (R. 210).

---

[1] Awerbuch was transcribed as Auerbach in the record.

Plaintiff can lift 10 to 12 pounds, and the most he can lift on a regular basis is a gallon of milk (R. 203). Twice a month he lifts two gallons of gasoline when refueling his riding lawn mower. Plaintiff can sit for 2 hours before needing to move, and can stand or walk for about 40 minutes (R. 204). He can navigate stairs if there are not too many (R. 205). Plaintiff can use a step ladder. He has difficulty reaching or working with his arms overhead, and can kneel to pick up objects from the floor. Balance can be a problem due to loss of feeling and strength in his right leg (R. 206). Plaintiff experiences numbness in his leg and takes Motrin (800 milligrams) for pain.

Plaintiff attributes his pain to a herniated disc pinching on the sciatic nerve running down his right leg (R. 206-07). Leg pain is triggered by Plaintiff being on his feet for an extended period, and he experiences this pain once or twice a week. Plaintiff suffers from no pain other than that in his lower, middle back and down the right leg.

Following a laminectomy that gave incomplete relief, Plaintiff underwent a discogram to consider further treatment at L4-L5. Dr. Graziano suggested that Plaintiff undergo a fusion of his vertebrae, but he chose not to undergo further medical or surgical treatment because he is fearful that it might not work and could worsen his situation (R. 208). Plaintiff has not undergone any further injections. Plaintiff's lifestyle is very sedentary, and he hopes that he can continue with his present routines (R. 209). He does not believe that he can perform any work.

2. *Medical Evidence*

Rodney Norman, P.A., examined Plaintiff, on August 22, 2003, in preparation for his September 3, 2003, surgery noting that lower extremity strength was 5+ out of 5+, and reflexes

were 1+ out of 4+ (R. 130).

On September 3, 2003, Plaintiff was admitted to Covenant Healthcare; Saginaw, Michigan, for microdisectomy surgery at L4-L5 (R. 108). Post-operatively, Plaintiff had good strength in the bilateral lower extremities scoring "5+/5+." Plaintiff was discharged on September 4, 2003, with a chairback brace and Vicodin-ES.

P.A. Norman conducted a post-operative examination of Plaintiff on September 18, 2003, noting that Plaintiff still had lower back pain with some right lower extremity pain, tingling, and numbness (R. 129). Lower extremity strength was determined to be 5+ out of 5+, and his reflexes were 2+ out of 4+. P.A. Norman noted that "patient has been agitated about the importance of not doing his old job, which consisted of a lot of manual labor and could lead to an increased strain on is lumbosacral spine. The patient has agreed that he will quit his old job."

Plaintiff followed-up with Kevin F. Brown, D.O., on November 10, 2003, telling him that his pain rated 5 on a scale of 10 (R. 173). Pain and tingling in the extremities was intermittent, but there was no radicular leg pain.

Thomas E. O'Hara, Jr., M.D., examined Plaintiff on November 20, 2003, noting that Plaintiff experienced occasional numbness and tingling in his right leg. Dr. O'Hara found that Plaintiff's weakness in the right extensor hallucis longus muscle had resolved, but a slight decrease in sensation to pinprick and light touch over the dorsal aspect of the right foot was noted. Plaintiff's gait was normal. Dr. O'Hara planned to recommend that Plaintiff be in aquatic therapy three times a week for six weeks noting that if Plaintiff does well, "we may be able to clear him to return to work" (R. 128).

On December 15, 2003, Plaintiff agreed with Dr. Brown that he cannot return to his prior

4

work (R. 170). Dr. Brown noted that Dr. O'Hara shared his belief that Plaintiff would not likely be able to return to his prior work. Plaintiff appeared relatively stable and forward flexes to about 50% before experiencing back pain. No focal weakness was observed in Plaintiff's lower extremities.

Sanjay J. Talata, M.D., conducted an MRI examination of Plaintiff's spine finding lumbar vertebral body height and alignment normal (R. 123). Degenerative disc bulging at the posterior central aspect of the L5-S1 bulging disc remained unchanged (R. 124).

At a January 12, 2004, examination with Dr. O'Hara, Plaintiff indicated that pain has diminished since his January 5th meeting and rated his back pain as 2 on a scale of 1-5. Plaintiff experienced no numbness, tingling, or weakness in the lower right limb, and did not complain of any pain, numbness or weakness in the lower left limb. He had normal curvature of the spine and pain that radiates into the upper right buttock. He exhibited normal strength in both lower limbs, and weakness of the right extensor hallucis longus muscle had been resolved completely by his surgery. Dr. O'Hara believed that there was recurrent disc herniation on the right at L4-L5 and a degenerated disc at L5-S1 – probably asymptomatic (R. 122).

On January 26, 2004, Dr. Brown observed that Plaintiff seemed to be having problems since his September 3, 2003, surgery possibly due to his use of a pedal device at work (R. 167). No ankle dorsiflexor or EHL weakness was observed. Plaintiff had some sensory loss in his lower extremity as well as pain associated with knee extensions.

Dr. Brown rechecked Plaintiff on March 8, 2004, finding that Plaintiff did not appear to have the tilting he had prior to surgery (R. 164). Plaintiff had limited flexibility in the lumbar spine and diminished reflexes at the ankles. Dr. Brown noted that Drs. O'Hara and Schinco want

5

Plaintiff to undergo further examination.

A May 5, 2004, CT scan was compared to a prior June 19, 2003, CT scan and a January 8, 2004, MRI (R. 117). The May 5 CT scan showed a mild degree of right central disc herniation impinging on the intraspinal right L5 nerve root. Compared to the June 19, 2003, CT scan, the right paracentral extradural impression on thecal sac at L4-L5 was less pronounced. The existing L4 nerve roots were uneffaced and the mild central disc bulge at L5-S1 was unchanged from the prior examination (R. 118).

Dr. Brown, on May 10, 2004, noted that Plaintiff had some radicular pain down the right leg but appeared neurologically stable (R. 162). Motor examination was normal and gait was satisfactory.

A May 13, 2004, neurological examination showed evidence of residual disc protrusion at L4-L5 (R. 115). Dr. Schinco found Plaintiff's lumbar incision well healed (R. 115). Straight leg raising was positive, and peripheral pulses were intact. Motor strength testing demonstrated some weakness of extensor hallucis longus function, and the lumbar myelogram

On June 7, 2004, Dr. Brown agreed with Dr. Schinco that Plaintiff undergo surgery to address disc herniation at L4-L5, and noted that Plaintiff does not appear to have a progressive loss of feeling in his lower extremities or any other neurological problems (R. 159). Dr. Brown noted Plaintiff had not recovered from the September 3, 2003, surgery as expected.

Dr. Brown examined Plaintiff on August, 9, 2004, noting that Plaintiff's status is unchanged (R. 158).

Dr. Brown's September 13, 2004, notes indicated an EMG/nerve conduction study showed post-surgical changes in lumbar spinal muscles and no findings to suggest radiculopathy

6

(R. 139, 155-56). While there was no progressive nerve damage, Dr. Brown stated that "he is disabled on an ongoing basis at this time from return to work activities."

On November 8, 2004, Dr. Brown found that Plaintiff continued to experience some back and leg pain (R. 152). Lower extremity strength ass satisfactory, and deep tendon reflexes were symmetric at +2.

A Physical Residual Functional Capacity Assessment of Plaintiff found that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and engage in unlimited pushing and pulling (R. 132). He could frequently balance, stoop, kneel, crouch, and crawl; never use a ladder, rope, or scaffold; and occasionally use ramps or stairs (R. 133). Plaintiff had no manipulative, visual, or communicative limitations, and his only environmental limitation was concentrated exposure to the cold (R. 134-35). The examiner opined that Plaintiff's symptoms are attributable to a medically determinable impairment (R. 136).

On January 5, 2005, Dr. O'Hara examined Plaintiff who complained of increasing pain that registered as 3 on a scale of 1 to 5 (R. 125). Dr. O'Hara determined that most radicular symptoms have been resolved, and noted that Plaintiff's lower back pain is recurrent likely due to muscle strain.

Plaintiff was examined by Gregory P. Graziano, M.D., at the University of Michigan on January 10, 2005, where Dr. Graziano noted that a MRI revealed degenerative disc disease at several levels (R. 141-42). Plaintiff was referred to Dr. Chiodo who would conduct the discograms.

On February 7, 2005, Plaintiff was examined by Dr. Brown who reported that Dr.

7

Graziano had advised a fusion at L4-L5, and after a discogram a possible fusion at L5-S1 (R. 147). Plaintiff expressed opposition to fusion given that this procedure has had poor results for people he knows. Dr. Brown did not think it realistic that fusion surgery would provide complete relief of back pain. Plaintiff appeared neurologically intact with some more diffuse sensory loss in the right lower extremity. Dr. Brown suggested a trial of some Cox-II drugs, and put Plaintiff on Bextra 20 mg.

On March 14, 2005, Plaintiff told Dr. Brown that he does not want any surgical intervention (R. 145). Dr. Brown's plan was to continue conservative treatment with ibuprofen.

Dr. Awerbuch examined Plaintiff on August 30, 2005, noting that Plaintiff was symptomatic with persistent pain, weakness, and numbness in his right leg (R.181). Plaintiff declined further surgery with his pain being tolerable and stable as long as he limited his activities. Plaintiff's general health was deemed excellent, and Dr. Awerbuch discussed the merits of conservative treatment as opposed to surgery (R. 182). Results from nerve conduction studies were normal, and needle examination revealed denervation in the muscles innervated by right L5 radiculopathy and corresponding paraspinal muscles (R. 183).

Dr. Awerbuch, on November 18, 2005, reported that Plaintiff suffers from severe pain and disability. Should Plaintiff return to work, he recommended the following restrictions: no bending, twisting or lifting at the waist; sit/stand/lay down option; no climbing; no pushing, pulling, torquing, or power tools; temperature above 70 degrees; and days off as needed (R. 180).

At a January 16, 2006, examination by Dr. Awerbuch, Plaintiff still complained of back pain, weakness and numbness (R. 179). He expressed an interest in continuing a conservative

course of care including proper ergonomics, restrictions, limitations and home exercises.

On July 17, 2006, Dr. Awerbuch examined Plaintiff noting that he still suffers from chronic low back pain with radiculopathy and status post lumbar fusion (R. 185). Plaintiff's Motrin prescription was refilled, and treatment methods including therapy, acupuncture, and facet injections were discussed. Plaintiff expressed a desire to continue with his present conservative course of treatment.

### 3. *Vocational Evidence*

Vocational expert ("VE") Judith Katherine Findora characterized Plaintiff's past work as heavy and semi-skilled (R. 212).

ALJ Fina asked VE Findora a hypothetical question assuming someone of Plaintiff's age, education, work experience, skill, and able to lift up to 20 pounds occasionally, lift or carry up to 10 pounds frequently, stand or walk for up to six hours per 8 hour work day with normal break, able to sit or stand at will while never climbing ladders, ropes or scaffolds (R. 212-13). Such a person would also have to climb ramps/stairs occasionally, balance frequently, stoop and kneel occasionally and never crawl all while avoiding concentrated exposure to unprotected heights (R. 213). VE Findora opined that such a person could not perform Plaintiff's past work as it was exertionally heavy and provided no sit/stand option. Plaintiff possessed no transferable skills.

Assuming these same vocational factors and limitations VE Findora noted other jobs in the region which such a person could perform. Such jobs included: security guard (183,100 nationally, 6,100 regionally), cashier (586,300 nationally, 18,000 regionally), and file clerk (90,000 nationally, 3,000 regionally).

ALJ Fina posed a second hypothetical question assuming the same non-exertional limitations expressed in the first hypothetical, but the exertional limitation would be sedentary with the ability to lift up to 10 pounds occasionally, stand or walk for up to 2 hours in an 8 hour work day with normal breaks, sit for up to 6 hours in an 8 hour work day, and a sit/stand option (R. 214). VE Findora stated that such a person could perform the following jobs: cashier (649,800 nationally, 21,500 regionally), receptionist (402,000 nationally, 13,400 regionally), and assembly position (195,000 nationally, 6,500 regionally). VE Findora testified that the jobs she identified were consistent with the descriptions in Dictionary of Occupational Titles.

VE Findora noted that such jobs provide a 15 minute break in the morning and afternoon as well as 30 - 60 minute break for lunch (R. 214). One absence per month is generally considered acceptable, and exceeding the break or absence thresholds would eliminate one's ability to maintain employment.

### 4. ALJ Fina's Decision

ALJ Fina found that Plaintiff was insured for benefits through December 31, 2008, and had not engaged in substantial gainful activity since March 26, 2003, the alleged onset date. (R. 19). Plaintiff has "severe" impairments of chronic low back pain, status post herniated discs and discectomy, and a L5 radiculopathy, but none of these impairments equals any impairment listed in Appendix 1, Subpart P, Regulations No. 4. 20 C.F.R. § 404. The ALJ also determined that Plaintiff cannot perform any of his past relevant work, and that transferability of job skill was not material because the Medical-Vocational Rules support a finding of "not disabled" regardless of whether or not Plaintiff possessed transferrable skills (R. 22-23)

ALJ Fina determined that Plaintiff has the residual functional capacity to occasionally lift up to 20 pounds; frequently lift or carry up to 10 pounds; stand or walk up to 6 hours in an 8-hour workday with normal breaks and sit/stand option; occasionally climb ramps or stairs; never climb ladders, ropes or scaffolds; frequently balance; occasionally stoop, kneel or crouch; never crawl; and avoid exposure to unprotected heights (R. 19).

Based on Plaintiff's age, education, work experience and residual functional capacity, ALJ Fina found there are a significant number of jobs in the national economy which he could perform including the security guard, cashier and file clerk jobs identified by the VE. Accordingly, Plaintiff was found not disabled as defined in the Social Security Act (R. 24).

**II.    ANALYSIS**

**A.    Standards of Review**

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[2] A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

B.  **Factual Analysis**

Plaintiff asserts that error ALJ Fina erred as a matter of law by improperly concluding that Plaintiff did not meet or equal listing 1.04A, and by discounting Plaintiff's credibility thereby forming an inaccurate hypothetical (Dkt. # 8, p. 6). Plaintiff also claims that the Commissioner erred by failing to properly and accurately evaluate the medical opinions of Drs. Brown and Awerbuch. *Id*. at 13.

   1.  **Listing 1.04A and Plainitff's Credibility**

To support his claim under Listing 1.04A, Plaintiff notes that he was found to suffer from "right central disc herniation which is impinging on the intraspinal right L5 nerve root" (R. 117, 123-24). Further it was noted that nearly 2 ½ years after his September 2003 surgery, Plaintiff

---

[2] *See, e.g.*, *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinburger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

still had reduced range of motion and radiculopathy with reinnervation (R. 179, 181, 183). Plaintiff concludes by noting that Plaintiff met Listing 1.04A prior to surgery and that "it seems reasonable to conclude" that his worsening condition has meant that he has met this listing since August 2005, as well.

In order to satisfy § 1.04A, an individual must demonstrate: (a) neuro-anatomic distribution of pain; (b) limitation of motion of the spine; (c) motor loss (atrophy with associated muscle weakness or muscle weakness); (d) sensory or reflex loss; and (e) positive straight leg raise test, in both the sitting and supine positions. 20 C.F.R. Pt. 404, subpt. P, app. 1, § 1.04A.[3] The regulations require that in order to meet the listing, abnormalities must be established over time: "Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00D. The burden of establishing that the listing is met is on the Plaintiff, and the question for this Court is whether no reasonable fact finder could find Plaintiff's proofs on this issue to be lacking.

Plaintiff's disc herniation, lower back pain and radiation of the pain to the lower right

---

[3] Listing 1.04 provides:
> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

20 C.F.R. Pt. 404, subpt. P, app. 1, § 1.04A.

extremity are well-documented. Yet, to meet the requirements of Listing 1.04A there must be "evidence of nerve root compression" characterized by a number of listed symptoms 20 C.F.R. Pt. 404, subpt. P, app. 1, § 1.04A. Plaintiff does not argue that the more limited problems he has at L-5-S1 meet the listing. Rather his claim relates to the L4-L5 herniation. His brief relies primarily on a January 2004 MRI and May 2004 CT scan both read by Dr. Talati. Both refer to a mild, broad based, right central disc herniation at L4-L5 (R. 117, R.123). The MRI reading notes that this was "possibly impinging on the intraspinal right L45 nerve root.( R. 123). The CT reading is less equivocal in stating that the herniation at L4-L5 "is impinging on the intraspinal right L5 nerve root (R. 117). The L4 nerve roots are uneffaced. The report notes that the right paracentral extradural impression on the thecal sac at L4-L5 is slightly less pronounced than on a post myelogram CT examination done in June of 2003, which suggests that the September 2003 microdiskectomy provided some modest relief. Yet, in addition to this type of evidence of nerve root compression, Listing 1.4 requires the nerve root compression be exhibited through a number of related symptoms. Apparently, ALJ Fina was not convinced that these related symptoms – pain, limitation of motion, motor loss, atrophy, sensory or reflex loss – were sufficiently demonstrated or were not sufficiently consistent over time to meet Listing 1.4.

While Plaintiff clearly has back pain related to this disc herniation, throughout his treatment he exhibited good strength in his lower extremities including scoring 5+ out of 5+ three times on strength tests (R. 108, 129, 130). At his May 13, 2004, examination, Plaintiff exhibited some weakness of extensor hallucis longus function (R. 115), and on June 7, 2004, he exhibited weakness of his right EHL and ankle dorsiflexors. Such weakness would appear to be the exception. A November 8, 2004, examination revealed satisfactory strength (R. 152).

Subsequent examinations did not address increased weakness or muscle atrophy buttressing the notion that motor loss due to atrophy or loss of muscle strength was not an issue for Plaintiff.

With regard to sensory loss, tests following surgery showed some sensory loss (R. 162, 167), but subsequent tests showed no progressive loss (R. 159) and revealed that Plaintiff was neurologically intact (R. 115, 139, 155-56) even when there was diffuse sensory loss (R. 147). Reflexes were determined to be symmetrical (R. 152). Even with some diffuse sensory loss, it was observed that Plaintiff's gait and motor exam were normal and that he did not walk with assistive devices (R. 162) and did not suffer from abnormal mobility (R. 115).[4]

The Regulations note that "abnormal physical findings may be intermittent," and thus it requires their presence be established over a period of time. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00D. In August 30, 2005, Plaintiff declined further surgery with his pain being tolerable and stable as long as he limited his activities (R. 181). In November of that year and the following July, Dr. Awerbuch suggested that Plaintiff might benefit from chiropractic care, acupuncture, use of an inferential stimulator, or facet injections. Yet there is no indication he sought such additional treatment . Such a decision may be reasonable, but coupled with the larger record that is somewhat inconsistent and equivocal in its findings, it could be considered as evidence that Plaintiff's condition was stable, manageable with pain medication, and no longer worsening. Motrin is his only medicine and on repeated occasions it was noted that his pain is intermittent (R. 145, 147). Plaintiff, in his testimony, stated that he hoped that the present condition would remain the norm for at least the next 5 years (R. 209). All of these factors are

---

[4] An inability to "ambulate effectively" is part of Listing 1.04C, but is also applicable to an examination of 1.04A given that both a loss of strength and feeling can inhibit walking – something that did not happen in Plaintiff's case.

15

evidence supportive of the ALJ's finding that Plaintiff's condition does not meet or equal Listing 1.4. They also provide substantial evidence to discount Plaintiff's credibility concerning his more extreme claims on his symptoms and limitations.

Plaintiff has failed to point to sufficient medical evidence in the record for this Court to require the Commissioner to find that Plaintiff's disc herniation at L4-L5 meets or equals Listing 1.04A.

### 2. Proper Use of Treating Physicians' Opinions

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. The case law in this circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of disability is binding on the Social Security Administration as a matter of law.[5] The administrative decision could reject a properly supported treating physician's opinion of disability if the record contains "substantial evidence to the contrary." *Hardaway v. Sec'y of HHS*, 823 F.2d 922, 927 (6th Cir. 1987).

Under the Social Security Administration regulations, the Commissioner will generally give more weight to the opinions of treating sources, but it sets preconditions for doing so. 20 C.F.R. §404.1527 [SSI § 416.927]. The Commissioner will only be bound by a treating source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record." 20 C.F.R.

---

[5]*See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).

§ 404.1527(d) [SSI § 916.927(d)].

The regulation also limits the subjects upon which the Commissioner must defer to a treating source opinion to "the issue[s] of the nature and severity of your impairment[s]." 20 C.F.R. § 404.1527(d)(2). Under 20 C.F.R. § 404.1527(e), the Commissioner will not defer or provide special significance to treating source opinions on certain subjects that are "reserved to the Secretary" which includes treating physician opinions on a claimant's disability under the Listing, on residual functional capacity or a general and conclusory statement of disability or inability to work. Thus, while deferring in part to the court-created "treating physician rule," the Commissioner's 1991 regulation in large measure rejects prior circuit case law that gave enhanced weight to treating physician opinions regarding disability under the Listing, on residual functioning capacity, or on general statements of disability.

In the present case, the portions of Plaintiff's treating physician's opinions to which the ALJ was required to defer, or at least treat with special significance, were the diagnoses of chronic low back pain, status post herniated discs and discectomy, and L5 radiculopathy (R. 19). Yet, ALJ Fina did this in adopting these impairments as severe in making his determination (R. 19-24). Plaintiff argues that the ALJ was also required to give deferential weight to the observations of Drs. Brown and Awerbuch that Plaintiff is unable to perform any work, and is "disabled". Such a determination is reserved for the Commissioner. 20 C.F.R.§ 404.1527(e)(1); *Workman v. Comm'r of Soc. Sec.*, 105 Fed. Appx. 794, 800 (6th Cir. 2004) (A treating physician's conclusory statement that a claimant is disabled is not controlling because the ultimate determination of whether a claimant is disabled rests with the Commissioner.); *Wallace,* 367 F. Supp.2d at 1133. *See* 20 C.F.R. § 416.927(d) (providing that poorly supported opinions are

entitled to little weight); *Bogle, v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993) ("[T]reating physician's opinions ... receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence.").

ALJ Fina noted that he did not agree with Dr. Awerbuch's assessment of Plaintiff's residual functional capacity due to his brief treatment of Plaintiff. Granting lesser weight to a physician's assessment due the limited duration of treatment is provided for by the Regulations. *See* C.F.R. § 404.1527(d)(2)(I). The record indicated Plaintiff saw Dr. Awerbach August 30, 2005 (R. 181),[6] and again on January 16, 2006 (R. 179) and July 17, 2006 (R. 185). Yet, his opinion on disability is in a November 18, 2005, letter which appears to be based on a single visit in August of that year (R. 180) . In stating that he did not believe Plaintiff "is capable of working in any capacity," Dr. Awerbuch provided a list of restrictions that he would impose on Plaintiff's working conditions: no bending, twisting or lifting at the waist; sit/stand/lay down option; no climbing; no pushing, pulling, torquing, or power tools; temperature above 70 degrees; and days off as needed (R. 180). Many of these restrictions: sit/stand option; never climbing ladders, ropes or ladders; and a sedentary exertional level were utilized by ALJ Fina in his second hypothetical to VE Findora (R. 213-14). Again, it is for the Commissioner (with the aid of vocational experts) to determine whether an individual can perform a limited but significant range of gainful employment, not the treating physician.

Like Dr. Awerbuch, Dr. Brown's opinion that Plaintiff was unable to perform any work (R. 156) was discredited by ALJ Fina who noted that Dr. Brown observed that Plaintiff's pain had become more intermittent while his strength and gait remained satisfactory (R. 22 referring to

---

[6] A November 18, 2005, letter says Dr. Awerbuch saw "Mr. Red" in August 3, but this date, like the name may have been a typographical error. (R. 180).

R. 147). Plaintiff's use of only Motrin to control pain indicated that his pain was being effectively managed (R. 181, 206). Plaintiff's personal activities also influenced the ALJ's decision as he was able to take his children to school, care for his daily needs, fuel and operate his riding lawn mower, climb a few steps up a ladder, and regularly pick up take-out food (R. 22 referring to R. 202-03, R. 205).

ALJ Fina on this record was within his proper scope of discretion in rejecting the two doctors opinions on whether Plaintiff could perform substantial gainful employment. The record supports a finding that Plaintiff's pain is tolerable with medication and stable as long as he limited his activities, and that there are a significant number of light jobs with a sit stand opinion that accommodate Plaintiff's restrictions.

## III. RECOMMENDATION

For the reasons stated above, it is recommended that Defendant's Motion for Summary Judgment be **GRANTED** and Plaintiff's motion be **DENIED**. Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

Note: any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than ten days after service an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

DATED: September 19, 2008    s/ Steven D. Pepe
STEVEN D. PEPE
United States Magistrate Judge

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing *Report and Recommendation* was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 19, 2008 .

s/ Vee Sims
Case Manager to Magistrate
Judge Steven D. Pepe
(734) 741-2298